**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

**KELLEE KENDELL,**

**Plaintiff,**

**v.**                                                 **Civil Action 2:20-cv-985**
                                                       **Magistrate Judge Kimberly A. Jolson**

**CLEMENT BURR SHANKLIN,**

**Defendant.**

**OPINION AND ORDER**

This matter, in which the parties have consented to the jurisdiction of the Magistrate Judge

under 28 U.S.C. § 636(c) (*see* Docs. 38, 39), is before the Court on Defendant's Motion to Enforce

Settlement Agreement (Doc. 112). For the following reasons, the Motion is **GRANTED**, and

Plaintiffs' outstanding motions (Docs. 90, 92, 95, 107, 121) are **DENIED as moot**. The parties

are **ORDERED** to perform in accordance with their settlement agreement (Doc. 114), as detailed

further in the conclusion of this Opinion and Order. Given this disposition, the parties shall submit

their notice of dismissal or agreed dismissal order on or before **August 11, 2022**.

**I.     BACKGROUND**

The Court previously summarized the background giving rise to this action:

> This case involves a relationship turned sour. Plaintiff Kellee Kendell first met
> Defendant Clement Shanklin in 1989 in Columbus, Ohio. (Doc. 1, ¶ 6). Decades
> passed, and the two reconnected over Facebook in February 2017. (*Id*.). At that
> time, Plaintiff lived in Atlanta, Georgia, and the two would travel back and forth
> between Columbus and Atlanta to visit one another. (*Id*., ¶ 7). Plaintiff alleges
> that, during these visits, Clement Shanklin "display[ed] a false sense of his
> resources" and "convinced Plaintiff" to cohabitate—with the promise that he
> "would carry his share of the load." This "empty" promise, says Plaintiff, was the
> first of many. (*Id*.). Yet, Plaintiff says she still believed Clement Shanklin's
> promises in November 2017, and he moved to Atlanta to live with her. Plaintiff
> claims that this arrangement was premised on a specific promise: Clement
> Shanklin "would reimburse [her] for his share of living expenses and pay her car
> note[.]" (*Id*., ¶ 8). Plaintiff now claims this was all a scam.

Plaintiff further alleges that Clement Shanklin's scheme was not his alone. Instead, says Plaintiff, it was a family affair. With his siblings, George Shanklin and Dolly Days, Clement Shanklin ran an investment company, Pinnacle. (*Id.*, ¶¶ 5, 9). To further his "confidence trick," Plaintiff avers that Clement Shanklin "involve[d]" her in Pinnacle's business in an effort to "reassure[]" her he was flush enough to pay her back. (*Id.*). To perpetuate the scheme, Clement Shanklin "would show Plaintiff email[s] [and] text messages with transaction codes from numerous banks," as well as "conversations he was having with numerous brokers regarding transactions." (*Id.*).

Based upon repeated assurances of repayment, Plaintiff says she "continued to divert funds she would have otherwise used to pay [] her credit cards, car note and mortgage to pay [Clement] Shanklin's living expenses[.]" (*Id.*, ¶ 10). And that was not the end of it according to Plaintiff. "Observing [her] significant stress and mental anxiety," Clement Shanklin "kept his confidence trick alive" by telling her he had a sizeable UPS retirement account and promising he would use these funds to repay her. (*Id.*). Plaintiff alleges Clement Shanklin's empty promises did her real harm because she ultimately had to sell her house "to avoid foreclosure." (*Id.*).

When Plaintiff eventually realized Clement Shanklin's alleged scheme, she kicked him out of her house, and he returned to Columbus. (*Id.*, ¶ 11). Still, he "continued to reassure [her] that he would satisfy his debt," which included "living expenses, a new house, and a new car." (*Id.*). According to Plaintiff, Clement Shanklin estimated his debt to be $400,000. (*Id.*).

Despite his alleged promises to repay, Plaintiff received nothing. So, in February 2020, she sued him, along with his siblings, George Shanklin and Dolly Days, and their investment company, Pinnacle. (*See* Doc. 1).

(Doc. 47 at 2–4).

Early in this action, the parties agreed "to make a good faith effort to settle this case." (Doc. 29 at 3). Accordingly, the Court referred the case to its first mediation in July 2020, and attorney Elizabeth T. Smith was assigned as the mediator. (Doc. 38). That mediation resulted in the case being reported settled for the first time. (Doc. 44). Yet, a month later, Plaintiff informed the Court that the settlement agreement was no longer in place, and the Court ordered the parties to proceed with discovery. (Doc. 45).

The Court then granted motions to dismiss several of Plaintiff's claims. (*See* Doc. 47). Plaintiff subsequently moved to amend her complaint (Doc. 50), which the Court granted (Doc.

68).   Now, only claims for breach of contract, fraud in the inducement, emotional distress, promissory estoppel, and unjust enrichment against Defendant Clement Shanklin remain.  (*See* Doc. 69).

When discovery closed in the case, and neither side filed a dispositive motion, the Court referred the parties to mediation before Magistrate Judge Terrence P. Kemp (ret.).  Following that second mediation, the parties again reported that they had reached a settlement in principle, which required Defendant to make a payment by September 1, 2021.  (Doc. 87).  Defendant then represented that emergent health concerns delayed his compliance with that deadline, so the Court granted an extension until September 10, 2021.  (Doc. 89).  When Defendant failed to make payment by that deadline, Plaintiff filed the first of her miscellaneous outstanding motions, a so-called Motion to Show Cause, that requested that Defendant be "sanctioned by imprisonment, a fine and an award to Plaintiff of costs of this motion, including attorney fees, and interest at a statutory rate from the date of the Order."  (Doc. 90 at 1).

The parties then came before the Court for a status conference, in which the settlement was discussed, and Defendant requested until September 27, 2021, to make the requisite payment.  (Doc. 91).  The Court indicated that should he fail to do so, Plaintiff had the right to move to enforce the settlement.  (*Id.*).  Plaintiff did not take that path.  Rather, she renewed her request that Defendant be sanctioned with another motion.  (Doc. 92).  After the Court indicated it would treat Plaintiff's motion as a Motion to Enforce Settlement (Doc. 93), Defendant responded to request that the Court require the parties to set up a payment plan for the mediated settlement amount.  (Doc. 94).  Simultaneously, Plaintiff asked the Court to set a trial date and indicated that she was "not prepared to continue [with settlement] in the face of Defendant's refusal to comply . . . ." (Doc. 95).

Given the inexhaustible disputes between the parties, the Court set a case management conference, and opened an escrow account in which Defendant could deposit funds for settlement in a show of good faith. (Doc. 97). He did so twice before the case management conference. At the conference, the Court stated its intention to refer the case to a third mediation. (Doc. 104). Though Plaintiff's counsel now notes his objection to mediation at the conference and further intimates a general unwillingness to engage in the third mediation (*see* Doc. 115 at 2; Doc. 119 at 2), he sent a detailed proposed plan for settlement to the Court only days after the case management conference, on December 13, 2021 (Doc. 115 at 2), requesting that the plan be presented to Defendant. Consistent with the procedure identified shortly following the conference (Doc. 104), the Court assigned attorney Shawn Judge to preside over the mediation (Doc. 105), and appointed attorney Douglas Paul Holthus as counsel for Defendant for the limited purpose of representing him in mediation (Doc. 106). Before this mediation took place, Plaintiff again requested that the Court set a trial date—her fourth miscellaneous motion now before the Court. (Doc. 107).

The mediator reported the case as settled following the mediation. (Doc. 109). But when the parties did not file a dismissal entry—and again came before the Court for a conference—counsel for Defendant represented that the parties had agreed to eight material terms of settlement, which the mediator had memorialized in writing, but the parties stalled in drafting the final settlement when Plaintiff indicated certain terms must be included in the agreement. (Doc. 111). Accordingly, the Court ordered that, should either party wish to enforce the settlement as agreed to at the mediation, that party had thirty days to do so. (*Id.*). Otherwise, a trial date would be set. Within that period, Defendant filed his Motion to Enforce Settlement Agreement (Doc. 112), the mediator submitted the memorialized material terms to the Court (Docs. 113, 114), and Plaintiff filed her Response (Doc. 115).

4

In her Response, Plaintiff—seemingly unaware of the Court's request to the mediator to provide his memorialization (Docs. 113, 114)—noted the absence of settlement terms in the record before the Court. (Doc. 115 at 3). Accordingly, the Court afforded her the opportunity to file a supplemental response addressing the settlement terms provided by the Mediator, and Defendant the opportunity to reply to such response. (Docs. 116, 118). Those supplemental briefings were filed (Docs. 119, 120), and the matter is ripe for consideration.

## II.    STANDARD

"It is well established that courts retain the inherent power to enforce agreements entered into in settlement of litigation pending before them." *Brock v. Scheuner Corp.*, 841 F.2d 151, 154 (6th Cir. 1988) (quoting *Aro Corp. v. Allied Witan Co.*, 531 F.2d 1368, 1371 (6th Cir. 1976)). To enforce a settlement agreement, "a district court must conclude that agreement has been reached on all material terms." *RE/MAX Intern., Inc. v. Realty One, Inc.*, 271 F.3d 633, 645–46 (6th Cir. 2001) (citing *Brock*, 841 F.2d at 154). When disputed facts surround the agreement, an evidentiary hearing is normally required; yet, when there is unambiguous agreement as to material terms, no evidentiary hearing is necessary. *Id.* at 646; *see also Aro Corp.*, 531 F.2d at 1372.

Because settlement agreements are "a type of contract, enforceable by either party[,]" the Court applies Ohio contract law to determine whether the parties reached an agreement. *Smith v. HPR Clinic, LLC*, No. 2:19-cv-464, 2021 WL 1345418 at *2 (S.D. Ohio Apr. 12, 2021); *Newman v. Gaudet*, No. 1:06-cv-614-SSB-TSH, 2007 WL 9734375 at *3 (S.D. Ohio Feb. 1, 2007). "In Ohio, a valid contract requires 'a meeting of the minds as well as an offer and acceptance.'" *HPR Clinic, LLC*, 2021 WL 1345418 at *2 (quoting *Smith v. ABN AMRO Mortg. Grp., Inc.*, 434 F. App'x 454, 460 (6th Cir. 2011)). Regarding a meeting of the minds:

> Ohio law does not require contracting parties to share a subjective meeting of the minds to establish a valid contract; otherwise no matter how clearly the parties

wrote their contract, one party could escape its requirements simply by contending that it did not understand them at the time. What it does require is that the terms of the agreement establish an objective meeting of the minds, which is to say that the contract was clear and unambiguous.

*Id.* (quoting *216 Jamaica Ave., LLC v. S & R Playhouse Realty Co.*, 540 F.3d 433, 440 (6th Cir. 2008)).

## III.    DISCUSSION

Defendant moves to enforce the settlement agreement reached by the parties at the April 8, 2022, mediation before Shawn Judge. (Doc. 112 at 1). He says that agreement was clear and binding but was later undermined by "Plaintiff's counsel['s] attempt[ ] to insert new language into the agreement" beyond the prior agreed-to material terms. (*Id.* at 3). Plaintiff argues that: (1) because Defendant did not submit the settlement agreement with his motion, the Court may not enforce it; (2) there was no meeting of the minds; and (3) as an alternative, she is willing to remove some of the additional terms she seeks to add to the agreement. (*See* Doc. 115).

The Court notes at the outset that no evidentiary hearing was required to resolve the present motion. Notably, neither party requested one. *RE/MAX*, 271 F.3d at 646 ("No evidentiary hearing was held in the instant case because neither party requested one."). Nor did the Court find that a hearing was required, given that the mediator's memorialization clearly and unambiguously sets forth the agreement's essential terms, and no issue of fact is present. *Id.* ("[No hearing] was required because the record shows that all the essential terms had been agreed upon . . . and all that remained was to sort out the non-material details and put the agreement in writing."). The Court addresses each of Plaintiff's arguments against enforcement in turn.

First, though Plaintiff is correct in stating that Defendant did not provide the precise terms of the agreement to the Court, this was merely an oversight. Defendant, proceeding pro se, was under the misapprehension that the Court already had received a copy of the mediation

6

memorialization from mediator Shawn Judge. (Doc. 112 at 2) ("The mediation was conducted on Friday, April 8, 2022 . . . a successful conclusion was reached about three hours into the session. Terms and conditions were memorialized by Mediator Shawn Judge and forward to the Court."). The Court thus ordered that the memorialization be submitted to the Court (Doc. 113), the mediator complied promptly, and the memorialization was added to the docket (Doc. 114). Though Plaintiff argued that this oversight left her "[un]equipped to respond to Defendant's enforcement request" (Doc. 115 at 1), the Court permitted her to respond in a supplemental brief (Doc. 118), and therefore Plaintiff's first argument against enforcement is moot. Plaintiff has been afforded ample opportunity to respond to Defendant's Motion.

Plaintiff next argues that her own proposed settlement agreement, which includes terms not memorialized by the mediator, contains all the material terms and there can be no "requisite meeting of the minds [ ] present [without] agreement on these material [terms]." (Doc. 115 at 4). Particularly, these additional terms include a fifty-dollar penalty fee whenever a settlement payment is late, quarterly certification by Defendant of his after-acquired income, submission of Defendant's yearly tax return to Plaintiff, and monthly notarized statements by Defendant detailing actions made in pursuit of accelerated liquidation of the settlement payment. (*Id.*; Doc. 115-2, ¶¶ 2.1.1–2, 2.1.4–5). She argues that because these terms were present in her initial settlement offer, they are material terms that are part of the "mediation record," of which the mediator's memorialization is also only "part." (Doc. 119 at 2–3). But the record unequivocally establishes that there was an objective meeting of the minds between the parties as to eight material terms, none of which encompass the terms Plaintiff now claims are material.

In his memorialization, mediator Shawn Judge stated:

At the conclusion of the mediation, the parties reached a settlement. As the mediator, I reviewed the material terms of the settlement with the participants: Mr.

> Joseph Tann and Ms. Kellee Kendell (Plaintiff) and Mr. Doug Holthus and Mr. Clement Shanklin (Defendant).  I received the verbal affirmation of counsel and their clients that the parties have agreed to the material terms of the settlement.

(Doc. 114 at 1).  He then set forth the eight material terms of the settlement, none of which included penalty payments, certification of after-acquired income, or submission of tax returns or notarized statements regarding accelerated liquidation.  (*Id.* at 1–2).  He further "attest[ed] that this letter contains all material terms of the settlement as I understand them to be and *as I communicated them to the mediation participants identified above*."  (*Id.* at 2) (emphasis added).  The material terms of the settlement agreement were clear and unambiguous, presented to the parties and counsel, and affirmed by the parties and counsel.  The Court therefore finds that there was an objective meeting of the minds and thus the settlement agreement as memorialized is a valid, enforceable contract.

Plaintiff attempts to rely on her preliminary settlement offer, provided to the mediator and Defendant before mediation, to support additional material terms.  (Doc. 115 at 3–4; Doc. 119 at 2–3).  While true that Plaintiff's initial requests included language around certification of after-acquired income, liquidation efforts, and failure to make timely payments (Doc. 115-1, ¶¶ 4(f)–(g), (i)), this does not support that those terms must be part of the final agreed settlement, particularly in the face of the contrary unambiguous material terms set forth in the memorialization.  Indeed, it is the nature of mediation that parties will make their most stringent requests in the preliminary demand phase, but later meet somewhere in the middle through compromise and negotiation at the mediation.  Certainly where, as here, the parties agree to a set of material terms at the conclusion of a mediation, which are represented to be "all material terms of the settlement[,]" that agreement displaces any offer that preceded it.  (Doc. 114 at 2).

If the additional language in Plaintiff's offer was material to the settlement agreement, she and her counsel should have made sure it was part of the material terms they both affirmed at the

mediation. For the Court to find otherwise would allow the impermissible outcome of permitting "hindsight regrets . . . to unilaterally reopen or throw out concluded negotiations." *Tsakanikas v. Nationstar Mortg., LLC*, No. 2:12-cv-176, 2013 WL 3155777 at *3 (S.D. Ohio June 20, 2013) (noting, "it is an admission of apparent negligence if Plaintiffs indeed intended for [a particular term] to be the potentially dealbreaking component of their settlement[,]" because they did not raise the issue at the mediation "when it was logical to do so"). More still, Plaintiff and her counsel remained silent when the mediator memorialized the material terms in writing (Doc. 114), reported to the Court that the case was settled (Doc. 109), and the Court accepted that report (Doc. 110). Over a month elapsed between April 8, when the material terms were memorialized by the mediator and sent to the parties, and May 10, when Plaintiff first raised before the Court, by email, that there were issues with the settlement agreement. "It makes no sense that Plaintiff[ ] or [her] counsel would ignore their duty to speak if they truly believed both the mediator and this Court were wrong." *Tsakanikas*, 2013 WL 3155777 at *3.

In fact, Plaintiff makes no argument that the mediator was wrong. She does not suggest that the mediator was under any misapprehension or in any way failed to carry out his duty. (*See* Docs. 115, 119). Rather, she only maintains that because the mediation memorialization provided that "[t]he parties shall in good faith work together to effectuate a written settlement agreement[,]" (Doc. 114 at 2), the memorialization supposedly recognized that additional "settlement agreement details" were needed to effectuate agreement (Doc. 119 at 3). But material terms are not mere details, and the mediator's simple directive that the parties would be responsible for drafting a final written instrument does not undermine the finality of his memorialization of material terms. "The existence of a valid agreement is not diminished by the fact that the parties have yet to memorialize the agreement. When parties have agreed on the essential terms of a settlement, and all that

9

remains is to memorialize the agreement in writing, the parties are bound by the terms of the oral agreement." *RE/MAX*, 271 F.3d at 646 (citations omitted). Plaintiff cannot avoid that her objective acts, as well as Defendant's, reflected that a final agreement had been reached.

Finally, Plaintiff makes the seeming concession that she "is willing to remove the after-acquired income, property and/or assets and accelerated liquidation certification from her proposed settlement agreement[,]" presumably maintaining the penalty payments as the only new term, and "conclude the settlement." (Doc. 115 at 5). But Plaintiff is not in the position to make a new settlement offer, as the Court has determined that she previously entered a valid settlement, which Defendant wishes to enforce.

Simply put, the parties entered a settlement agreement on April 8, 2022. That agreement unambiguously comprised eight material terms, which both parties and their counsel accepted as comprising the entirety of the material terms of their settlement. Neither party may now unilaterally revoke such agreement to secure more favorable terms. The parties must now comply with the settlement agreement as memorialized by their mediator on April 8, 2022.

## IV.   CONCLUSION

For the foregoing reasons, Defendant's Motion to Enforce Settlement Agreement (Doc. 112) is **GRANTED.** Because the settlement agreement from the April 8 mediation is now the operative settlement agreement, the Court finds no reason to sanction Defendant regarding compliance with the earlier, ultimately unrealized settlement in principle. Nor is there any need to set a trial date now that the case has concluded by settlement. Further, Plaintiff's request for a teleconference on pending motions while this matter was under consideration is unnecessary given that the motions are resolved by this Opinion and Order. Accordingly, Plaintiff's various outstanding motions (Docs. 90, 92, 95, 107, 121) are **DENIED as moot**.

The parties are **ORDERED** to perform in accordance with their settlement agreement (Doc. 114).  The Clerk of Courts is **DIRECTED**, upon the filing of a notice of dismissal or dismissal order in this action, to release the funds in the Court's escrow account to Plaintiff, which shall comprise one-half of Defendant's first installment payment to Plaintiff.  Under the settlement agreement, Defendant is **ORDERED** to pay the remainder of that first installment, as well as subsequent monthly payments, at the agreed-upon rate, until the total agreed sum is paid.  Interest will accrue at the federal statutory interest rate.  Further, Defendant will pay Plaintiff 35% of any additional income acquired by Defendant above the income set forth in (Doc. 77), Defendant shall seek liquidation, and the agreement is subject to a default clause with standard cognovit note principles.

Given this disposition, the parties shall submit their notice of dismissal or agreed dismissal order on or before **August 11, 2022**.

IT IS SO ORDERED.

Date:  July 28, 2022                    /s/ Kimberly A. Jolson
                                        KIMBERLY A. JOLSON
                                        UNITED STATES MAGISTRATE JUDGE