IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

**KELLEE KENDELL,**

        **Plaintiff,**          Civil Action 2:20-cv-985
                                                    Magistrate Judge Kimberly A. Jolson

   **v.**

**CLEMENT BURR SHANKLIN, et al.,**

        **Defendants.**

**OPINION AND ORDER**

This matter, in which the parties have consented to the jurisdiction of the Magistrate Judge under 28 U.S.C. § 636(c) (*see* Docs. 38, 39), is before the Court on Plaintiff's Motion for Judgment Debtor Exam (Doc. 125) and Defendant's Motion for Sanctions (Doc. 128). For the following reasons, the Motion for Judgment Debtor Exam is **DENIED**, and the Motion for Sanctions is **GRANTED**. Plaintiff is **ORDERED** to pay $325 to Defendant, on or before June 30, 2023. The parties are **ORDERED** to file a corrected notice of voluntary dismissal on or before June 16, 2023.

**I.    BACKGROUND**

The Court previously summarized the background giving rise to this action:

This case involves a relationship turned sour. Plaintiff Kellee Kendell first met Defendant Clement Shanklin in 1989 in Columbus, Ohio. (Doc. 1, ¶ 6). Decades passed, and the two reconnected over Facebook in February 2017. (*Id.*). At that time, Plaintiff lived in Atlanta, Georgia, and the two would travel back and forth between Columbus and Atlanta to visit one another. (*Id.*, ¶ 7). Plaintiff alleges that, during these visits, Clement Shanklin "display[ed] a false sense of his resources" and "convinced Plaintiff" to cohabitate—with the promise that he "would carry his share of the load." This "empty" promise, says Plaintiff, was the first of many. (*Id.*). Yet, Plaintiff says she still believed Clement Shanklin's promises in November 2017, and he moved to Atlanta to live with her. Plaintiff claims that this arrangement was premised on a specific promise: Clement Shanklin "would reimburse [her] for his share of living expenses and pay her car note[.]" (*Id.*, ¶ 8). Plaintiff now claims this was all a scam.

> . . .
>
> Based upon repeated assurances of repayment, Plaintiff says she "continued to divert funds she would have otherwise used to pay [] her credit cards, car note and mortgage to pay [Clement] Shanklin's living expenses[.]" (*Id.*, ¶ 10). And that was not the end of it according to Plaintiff. "Observing [her] significant stress and mental anxiety," Clement Shanklin "kept his confidence trick alive" by telling her he had a sizeable UPS retirement account and promising he would use these funds to repay her. (*Id.*). Plaintiff alleges Clement Shanklin's empty promises did her real harm because she ultimately had to sell her house "to avoid foreclosure." (*Id.*).
>
> When Plaintiff eventually realized Clement Shanklin's alleged scheme, she kicked him out of her house, and he returned to Columbus. (*Id.*, ¶ 11). Still, he "continued to reassure [her] that he would satisfy his debt," which included "living expenses, a new house, and a new car." (*Id.*). According to Plaintiff, Clement Shanklin estimated his debt to be $400,000. (*Id.*).
>
> Despite his alleged promises to repay, Plaintiff received nothing. So, in February 2020, she sued him . . . . (*See* Doc. 1).

(Doc. 47 at 2–4).

Unfortunately, this litigation has been as acrimonious as the allegations giving rise to it. The Court previously detailed how from the outset of the litigation "Plaintiff's counsel and Defendant, who is proceeding pro se, have been unable to cooperate . . . ." (Doc. 84 at 1). Of particular concern was Plaintiff's counsel's refusal to attempt to resolve disputes before filing motions. (*Id.* at 1–2) (noting nine motions in which Plaintiff's counsel sought sanctions and fees from Defendant). This dissonance extended to all aspects of the case, including attempts at settlement.

The parties mediated this case three times. (Doc. 122 at 2–4) (summarizing the contentious history of mediation in the case). Each time, they represented that they had reached a settlement in principle. (*Id.*). And each time their agreement dissolved into interminable conflict. (*Id.*). Notably, when the second mediated settlement failed because Defendant did not make his first installment payment, Plaintiff's counsel asked that Defendant be "sanctioned by imprisonment[.]" (*Id.* at 3) (quoting Doc. 90 at 1).

When Plaintiff attempted to walk away from a third mediated settlement—one which had all its material terms carefully memorialized by the parties' mediator—Defendant asked the Court to enforce the settlement. (Doc. 112). The Court granted that motion (Doc. 122), and the parties dismissed the case (Doc. 123). But, only two weeks later, the parties were again involving the Court in their correspondence about settlement payments. (*See* Doc. 124). Accordingly, the Court then instructed:

> the parties are no longer permitted to contact the Court or its staff via email. This includes forwarding correspondence between the parties. They may raise any disputes in filings on the public docket. Further, as the parties have been quick to rely on Court intervention, they are advised that they should only bring meaningful disputes before the Court. Otherwise, the Court will assess fees or impose other appropriate sanctions.

(*Id.*).

For several months, the docket was quiet. But then Plaintiff filed the present Motion for Judgment Debtor Exam—not because Defendant had stopped remitting monthly payments—but because she learned that he had received a cost-of-living adjustment ("COLA") to his Social Security benefit and believed an examination was necessary "to judicially ascertain the existence of income and/or property which may then be applied toward compliance with the Judgment." (Doc. 125 at 3). Defendant responded by submitting a detailed affidavit describing his COLA and current income and expenses. (Doc. 127). He also brought a Motion for Sanctions under Federal Rule of Civil Procedure 11(b), arguing that Plaintiff and her counsel were objectively unreasonable in bringing the Motion for Judgment Debtor Exam. (Doc. 128).

The Court—also concerned about the reasonableness of Plaintiff's course of action—then ordered Plaintiff's counsel to submit the billing to his client for preparation of the Motion for Judgment Debtor Exam *ex parte*. (Doc. 130). The Court received that information (Doc. 136) and, hoping to head off this new conflict at the pass, reminded the parties of its directive that only

3

meaningful disputes should be brought before the Court (Doc. 131). It further noted that Plaintiff's argument regarding the COLA was "dubious at best[,]" Defendant had already provided updated information on his finances, and Plaintiff was pursuing her claims at substantial personal expense while she was still receiving regular monthly payments from Defendant. (*Id.*). Acknowledging this questionable use of resources, the Court presented the parties with an opportunity to confer and mutually withdraw their motions. (*Id.*).

But—true to form—agreement was not reached. (Docs. 132, 133). The Motions have been fully briefed (Docs. 126, 129, 134, 135) and are ripe for consideration.

**II.     STANDARD**

Rule 69(a) of the Federal Rules of Civil Procedure allows for post-judgement discovery. It states, in pertinent part, that "[i]n aid of the judgment . . . the judgment creditor . . . may obtain discovery from any person, including the judgment debtor, in the manner provided in these rules or in the manner provided by the practice of the state in which the district court is held." Fed. R. Civ. P. 69(a)(2). The scope of post-judgment discovery is broad and "'the judgment creditor must be given the freedom to make a broad inquiry to discover hidden or concealed assets of the judgment debtor.'" *Scioto Constr., Inc., v. Morris*, No. 4:99-cv-83, 2007 WL 108906, at *2 (E.D. Tenn. Jan. 9, 2007) (quoting *British Int'l Ins. Co., Ltd. v. Seguros La Republica, S.A.* 200 F.R.D. 586, 588 (W.D. Tex. 2000)). Also relevant here, the Ohio Revised Code provides that "[a] judgment creditor shall be entitled to an order for the examination of a judgment debtor concerning his property, income, or other means of satisfying the judgment upon proof by affidavit that such judgment is unpaid in whole or in part." O.R.C. § 2333.09.

Rule 11(b) of the Federal Rules of Civil Procedure provides that "by presenting to the court a [ ] written motion, . . . an attorney or unrepresented party certifies that . . . it is not being presented

4

for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation[.]" Fed. R. Civ. P. 11(b). "If the court determines that Rule 11(b) has been violated, the court may impose an appropriate sanction[.]" Fed. R. Civ. P. 11(c)(1). Importantly, "a motion for sanctions must be made separately from other motions and must not be filed with the Court until twenty-one days after it is served upon the opposing party." *Am. Home Assur. Co. v. Gagen*, No. 1:04CV581, 2005 WL 1705015, at *3 (S.D. Ohio July 20, 2005) (citing Fed. R. Civ. P. 11(c)(1)(A)).

Additionally, "[f]ederal courts possess certain inherent powers, not conferred by rule or statute, to manage their own affairs so as to achieve the orderly and expeditious disposition of cases." *Goodyear Tire & Rubber Co. v. Haeger*, 581 U.S. 101, 107 (2017) (citation and internal quotation marks omitted). Within this authority, a court may "fashion an appropriate sanction for conduct which abuses the judicial process." *Id.* (quoting *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44–45 (1991)). This includes the award of legal fees and costs incurred by a party when the opposing party has acted in bad faith. *Id.* (citing *Chambers*, 501 U.S. at 45).

### III.    DISCUSSION

#### A. Motion for Judgment Debtor Exam (Doc. 125)

Plaintiff says the judgment debtor exam is necessary for three reasons: (1) to discover any increases in Defendant's income such that he could now contribute more to his monthly payments; (2) to scrutinize Defendant's efforts to liquidate the judgment; and (3) to assess whether he can make payments at an earlier date each month. (Doc. 125 at 5). But, at base, Plaintiff's request must begin with a showing of proof that the "judgment is unpaid in whole or in part." O.R.C. § 2333.09. She has not carried this burden. The Court addresses each of Plaintiff's purported needs for the judgment debtor exam in turn, as each illustrates that Defendant has complied with his

major obligation: to pay the judgment in agreed-upon monthly installments. A judgment debtor exam is therefore not warranted.

First, the parties did agree "to an after-acquired income term in which Defendant will pay Plaintiff 35% [of] any additional income acquired by Defendant above the income set forth in his financial information (see Shanklin Affidavit, [Doc. 77]), with said additional money to be in addition to Defendant's regular monthly installment[.]" (Doc. 114 at 2). In that original affidavit, Defendant affirmed that he received "retirement income from two sources[:]" Social Security and the United Parcel Service. (Doc. 77). By his updated affidavit, Defendant has confirmed that he has no additional sources of income. (Doc. 127). Rather, his monthly Social Security benefit increased, because of the COLA, from $1,679 to $1,958. (*Compare* Doc. 77 *with* Doc. 127). As the Court has previously observed, however, it is unreasonable to characterize this COLA as an increase in income which could be contributed to the judgment. (Doc. 131 at 1).

COLAs are designed to counteract rising costs of living and leave a beneficiary in a materially equal position. Defendant—represented by counsel at mediation—negotiated a payment scheme by which he could contribute to the judgment each month while also managing his monthly expenses, which he itemized in the affidavit referenced in the settlement agreement. (Doc. 77). And, as detailed in his updated affidavit, those monthly expenses have increased over time. (Doc. 127). In fact, his expenses have increased more than his Social Security benefit. In other words, his COLA has been accompanied by the expected attendant rising costs of living, and he has no expanded capacity to contribute to the judgment.

The more reasonable reading of the after-acquired income term is that it contemplates a greater change in Defendant's circumstances than this. "Additional" income beyond what was known by the parties at the time they entered into the agreement. If, say, Defendant left retirement

6

and had a new source of income from employment—or he happened into some windfall. But the Social Security benefit was known to the parties at the time they entered into the agreement. And an adjustment to that benefit made only for the purpose of keeping the benefit equal against countervailing rising costs of living does not mean Defendant should be liable to pay a greater monthly payment on his judgment.

Tellingly, Plaintiff offers no caselaw in support of her position treating the COLA as additional income. Nor does common sense about the negotiated term support that position.

Second, the parties also agreed broadly "that Defendant shall seek to pursue liquidation." (Doc. 114 at 2). While Plaintiff maintains that Defendant has not notarized his efforts at liquidation to her satisfaction, "by providing written evidence such as a statement under oath identifying action steps and results," (Doc. 125-1 at 2), no language in the term calls for any such reporting procedure.

Third, the terms of the agreement state only that Defendant shall pay the judgment in monthly installments. (*See* Doc. 114). No date of payment is compelled by the language of the terms. But Plaintiff now insists she must be paid on the first of each month.

This is how the course of payments appears to have unfolded thus far: Defendant receives his United Parcel Service pension on the first of each month (Doc. 126 at 2) and immediately thereafter, he sends the payment by mail (Doc. 129-1 at 1). The delay in the mailed payment has frustrated Plaintiff, but her counsel has refused to accept Defendant's offers to make payment via mobile payment platforms like Cash App or Zelle. (*See id.*). And, Plaintiff's counsel has been inconsistent with his own representations about the payment date. In an August 8, 2022 email he sent to Defendant and a member of the Court's staff (before the parties were again instructed not to email the Court and its staff), he stated, "If you are mailing the required payments, I suggest you do so with sufficient lead time for receipt on or before the payment due date of the 10th of

7

each month." (Doc. 137 at 1). In other words, there was never a memorialized date for the monthly payments, and Plaintiff cannot unilaterally (and inconsistently) assert one now to suggest that Defendant has been delinquent in his compliance with the settlement agreement.

This is not a case of likely "hidden or concealed assets . . . ." *Scioto Constr., Inc.*, 2007 WL 108906, at *2. Defendant lives on a fixed retirement income and has been forthcoming about his income and assets. (Docs. 77, 127). Since the agreement was enforced, Plaintiff has received all monthly payments owed to her. The judgment has not been "unpaid in whole or in part[,]" and a judgment debtor exam is therefore not warranted. O.R.C. § 2333.09. Accordingly, Plaintiff's Motion (Doc. 125) is **DENIED**. But the questions about the propriety of this Motion extend far beyond its merits—and the Court turns to those questions now.

### B. Motion for Sanctions (Doc. 128)

Defendant says that Plaintiff and her counsel's pursuit of the above Motion for Judgment Debtor Exam was objectively unreasonable and therefore warrants sanctions under Rule 11. (Doc. 128 at 2); *see also First Bank of Marietta v. Hartford Underwriters Ins. Co.*, 307 F.3d 501, 517 (6th Cir. 2002) (internal quotation marks and citation omitted) ("[T]he imposition of Rule 11 sanctions requires a showing of objectively unreasonable conduct[.]"). Plaintiff says that Defendant has not described specific conduct warranting sanction, nor complied with Rule 11's safe harbor provision. (Doc. 134 at 3–5). The Court need not rely upon Rule 11, however. Instead, it finds Plaintiff and her counsel's conduct sufficiently egregious to warrant sanctions under the Court's inherent power.

Defendant says that though he has meaningfully complied with the settlement agreement, Plaintiff's counsel continues to harass him and attempt to enforce terms that were not part of the settlement agreement. (*See, e.g.,* Doc. 128 at 2) ("Plaintiff's counsel has continued to send

8

harassing emails to Defendant trying to force an earlier payment."). The Court agrees. Several points suggest that the Motion for Judgment Debtor Exam served more to harass Defendant and complicate this litigation than to forward Plaintiff's legitimate interests: (1) Plaintiff raised spurious arguments in the Motion; (2) she refused an opportunity to withdraw the Motion; (3) she failed to pursue alternative means to a judgment debtor exam; and (4) she litigated the Motion at very little apparent net benefit to herself, but at significant detriment to Defendant.

The Court has already described above how Plaintiff's contentions in her motion lacked legal and common-sense support. Even giving full benefit of the doubt to Plaintiff's arguments about the COLA—which though unavailing in the instant context, were not frivolous—other portions of the motion were altogether unfounded and unnecessary. Consider that Plaintiff tried to enforce payment on the first of each month, despite: not negotiating a date certain in the material terms of settlement; refusing to allow Defendant to use an online banking platform to make speedier payment; and previously maintaining that the payment due date was on the tenth of each month. Said differently, Plaintiff and her counsel refused to remedy a problem of their own making. Instead, they blamed Defendant and tried to misuse the power of the Court to resolve it.

Significantly, Plaintiff persisted with this questionable course even after being warned by the Court about the "dubious" nature of her contentions and being presented with the opportunity to withdraw them. (Doc. 131). As Plaintiff rightly notes, the imposition of Rule 11 sanctions here is not appropriate because Defendant did not abide by the safe-harbor provision and serve the Motion for Sanctions on her twenty-one days before filing. *See* Fed. R. Civ. P. 11(c)(2). The purpose of the safe-harbor provision is "to allow the nonmovant a reasonable period to reconsider the legal and factual basis for his contentions and, if necessary, to withdraw the offending document." *Penn, LLC v. Prosper Business Dev. Corp.*, 773 F.3d 764, 767 (6th Cir. 2014) (citing

9

Fed. R. Civ. P. 11(c) Advisory Committee Notes (1993 Amendments)). Nonetheless, Plaintiff was provided precisely this opportunity.

Defendant served the Motion for Sanctions upon Plaintiff the same day he filed it with the Court. (Doc. 128 at 6). Recognizing the position this put Plaintiff in, the Court issued an Order which postponed briefing on the Motion and gave Plaintiff until March 23, 2023—twenty-two days after the Motion for Sanctions was served—to consider withdrawing her motion before responding to the Motion for Sanctions. (*See* Doc. 131). The Court further specified that the Motion for Sanctions was pertinent only if Plaintiff declined to withdraw her own motion. (*Id.*). In other words, Plaintiff was afforded "a reasonable period to reconsider the legal and factual basis for h[er] contentions and, if necessary, to withdraw the offending document." *Penn, LLC*, 773 F.3d at 767 (6th Cir. 2014). But Plaintiff refused to reconsider her course in light of Defendant's objections and the Court's warning.

More still, there were other more effective mechanisms available to Plaintiff than a judgment debtor exam. Foremost among them, informal resolution by the parties without involving the Court. While conversations between Plaintiff's counsel and Defendant have been— and were in the present instance—inappropriately contentious on both sides (*see* Docs. 131-1– 131-4), the record also shows that Defendant made efforts at compromise which Plaintiff ultimately refused to accept (*see, e.g.,* Doc. 132-1 at 2–3 (offering electronic payment by the fifth of each month); *id.* at 3 (offering to increase monthly payment from $325 to $340)). Also, to the extent Plaintiff sought information she believed Defendant was withholding, she could have asked for post-judgment discovery in the form of less onerous mechanisms, like interrogatories. Indeed, Defendant was willing to provide sworn statements. (*See* Doc. 127) (updated financial affidavit). Instead, Plaintiff asked for Defendant to appear for an examination, which was likely to be

10

overwhelming to a pro se party, and likely to be adversarial given the relationship between Plaintiff's counsel and Defendant.

Additionally, the judgment debtor exam is a mechanism for discovery—but what Plaintiff seems primarily concerned with is enforcement. Plaintiff did not need to uncover information about Defendant's COLA through a judgment debtor exam. Rather, she was aware of the COLA and trying to assert a certain interpretation of the settlement agreement. So, even had the Court agreed with her, a judgment debtor exam would have been an unnecessary prelude to a request to enforce the judgment, wasting the resources of Plaintiff, Defendant, and the Court.

Finally—and perhaps most glaringly—the lack of net benefit to pursuing these claims suggests bad faith in bringing the Motion for Judgment Debtor Exam. Consider Plaintiff's monetary benefit had her claim to Defendant's COLA been successful. The COLA was $279. (Docs. 77, 127). If it was subject to the after-acquired income settlement term, Defendant would have to increase his monthly payments by 35% of $279, or $97.65. With this supplemental payment, it would have taken Plaintiff about two years ($2,343.60) to recoup the costs of her counsel's services in preparing the Motion for Judgment Debtor Exam ($2,334.50). (Doc. 136). And this does not even account for the further costs she incurred in responding to the Motion for Sanctions after refusing to withdraw her own motion; or would have incurred in conducting a judgment debtor exam, had the Court allowed one; or would have further incurred in trying to enforce the term. In other words, she has expended considerable resources at no discernable benefit.

While Plaintiff stood to receive little benefit from the increased payments given the attendant litigation costs, the increase in monthly payment would not have been insignificant to Defendant, who lives on a fixed retirement income. This leads the Court to the conclusion that

11

Plaintiff's counsel brought the motion to harass Defendant, increase the costs of the litigation, or both.

The Court has the inherent power to "fashion an appropriate sanction for conduct which abuses the judicial process." *Haeger*, 581 U.S. at 107. For all the reasons detailed above, the Court finds that Plaintiff and her counsel brought the Motion for Judgment Debtor Exam in bad faith. This was not an isolated incident, but part of an ongoing effort to harass Defendant and unnecessarily complicate this litigation. Having tried repeatedly to sanction Defendant throughout this litigation (Docs. 16, 17, 18, 46, 54, 57, 73, 74, 81, 90, 92, 95)—even asking that Defendant be imprisoned (Doc. 90)—Plaintiff and her counsel now try to make even his continued compliance with the settlement agreement onerous. This means that Defendant has spent considerable time conducting legal research and preparing oppositions in his own defense.

Monetary sanctions ordered under the Court's inherent power must be compensatory in nature. *Haeger*, 581 U.S. at 108. Accordingly, the Court now fashions a sanction that will compensate Defendant for costs associated with the misconduct at issue here. *See id.* It took a little over a month of conferral and briefing for this matter to be properly before the Court. (*See* Docs. 125, 134). Defendant should—at the least—be compensated for the time he devoted to these motions during that month. The Court will employ Defendant's monthly obligation under the judgment, $325, as the standard of compensation. Accordingly, Plaintiff is **ORDERED** to pay $325 to Defendant, on or before June 30, 2023.

In truth, sanctions for the present conduct could be much greater. While the exact contours of pre-Motion conferral between the parties are not before the Court, Plaintiff represents that she raised her baseless objections about payment due date as early as September 2022. (Doc. 125 at 2). And Defendant's COLA took effect in January 2023, so Plaintiff's "repeated requests" that

12

Defendant increase his monthly payment significantly preceded the Motion. (*Id.* at 2–3). So, it is likely that Defendant spent much more time defending against Plaintiff and her counsel's harassment than is immediately apparent to the Court. Should Plaintiff and her counsel continue with these harassing filings, the Court will not hesitate to impose future sanctions—and they will be more severe.

### C. Notice of Voluntary Dismissal

Finally, the Court briefly addresses something further the parties raised in briefing. Though the material terms of the settlement agreement specified that the agreement was "[i]n exchange for dismissal with prejudice of the instant case[,]" (Doc. 114 at 1), the notice of voluntary dismissal drafted by Plaintiff's counsel described the dismissal as "without prejudice." (Doc. 123 at 1). Plaintiff's counsel represents that this is a clerical error and can be corrected presently. (Doc. 134 at 3). Accordingly, the parties are **ORDERED** to file a corrected notice of voluntary dismissal on or before June 16, 2023.

## IV. CONCLUSION

For the foregoing reasons, the Motion for Judgment Debtor Exam (Doc. 125) is **DENIED**, and the Motion for Sanctions (Doc. 128) is **GRANTED**. Plaintiff is **ORDERED** to pay $325 to Defendant, on or before June 30, 2023. The parties are **ORDERED** to file a corrected notice of voluntary dismissal on or before June 16, 2023.

IT IS SO ORDERED.

Date: June 8, 2023            /s/ Kimberly A. Jolson
                                                  KIMBERLY A. JOLSON
                                                  UNITED STATES MAGISTRATE JUDGE